**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | |
|---|---|
| **In re Aflac Inc. Data Breach Litigation** | Case No. 4:25-CV-00183-CDL<br>**JURY TRIAL DEMANDED** |

# CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Hilda Abram, Kareen Campbell, Kimberly Cole, Christopher Cook, Alina Forbes-Campbell, Beda Gamboa, Eleanor Griffin, Beejay Lukban, Jeffrey Minter, Ismael Perez, Saralyn Salisbury-Jones, Larry Scott, Charlene Synoga, and Brandon White ("Plaintiffs") bring this Consolidated Class Action Complaint ("Complaint") against Defendant Aflac Incorporated ("Aflac" or "Defendant") to seek relief from Aflac on behalf of themselves and all others similarly situated. Plaintiffs make the following allegations based upon their personal knowledge and, as to all allegations not specific to Plaintiffs, on information and belief derived from investigation of counsel and matters of public record:

## INTRODUCTION

1. Aflac, an insurance company that collects, uses, and maintains sensitive, personally identifying information ("PII") and protected health information ("PHI") (collectively "Private Information") in the ordinary course of business owes a duty to the individuals whose Private Information was entrusted to Aflac. This duty arises based upon the Parties' relationship and because it is foreseeable that exposure of Private Information to unauthorized persons—and especially to hackers with nefarious intentions—will result in harm to the affected individuals.

2. The exposure of sensitive Private Information to hackers, commonly referred to as a "data breach" causes material harm to its victims in several ways, often manifesting in identity

theft and financial fraud, a substantially increased and certainly impending, present, and ongoing risk of identity theft crimes compared to the rest of the population (potentially for the rest of a victim's life), reputational harm, embarrassment, misuse of sensitive information, increased exposure to scams seeking to collect additional information, and even emotional distress. Mitigating the risk of even further harm, to the extent that it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial, and medical accounts, obtain appropriate insurance and monitoring tools, and take several additional prophylactic measures.[1]

3. Aflac is an insurance company that provides supplemental insurance to a population of individuals to help them manage out of pocket medical expenses not covered by traditional health insurance. Aflac touts its services as providing the coverage individuals deserve to gain "financial peace of mind."[2] Instead of the financial peace of mind which Plaintiffs and Class Members believed they were purchasing, they have now suffered ascertainable losses due to Aflac's implementation of inadequate data security safeguards and controls, its breach of duty to handle Private Information with reasonable care, and its failure to maintain the security of consumers' Private Information. As a result, Plaintiffs' and nearly 22.65 million other Class Members' Private Information is now in the hands of criminals.

4. Plaintiffs bring this action against Aflac for its failure to (i) properly secure and safeguard highly valuable Private Information; (ii) prevent and timely stop the unlawful disclosure of Plaintiffs' and Class Members' Private Information; and (iii) provide prompt and complete notice to all affected persons that their Private Information was impacted in a data breach of Aflac's

[1] *See* Federal Trade Commission, *What information was lost or exposed*, IdentityTheft.gov, https://www.identitytheft.gov/assets/pdf/Data_Breach.pdf

[2] Supplemental Health Insurance for Individuals & Families | Aflac, https://www.aflac.com/individuals/default.aspx.

systems that occurred in June 2025 (the "Data Breach").

5. Aflac is a Fortune 500 company and the largest provider of supplemental insurance in the United States, providing insurance protection for more than 50 million people worldwide.[3]

6. Plaintiffs and Class Members are current and former customers and beneficiaries of Aflac and its insurance products and services. Plaintiffs, as current or former customers or beneficiaries, provided their Private Information to Aflac as a requirement to obtain insurance products and services.

7. In June 2025, Aflac first disclosed that it identified suspicious activity on its IT network.[4]

8. Six months later, on December 19, 2025, Aflac confirmed on its website that the Private Information of approximately 22.65 million individuals was impacted in the June 12, 2025 Data Breach.[5]

9. Due to Aflac's data security failures which caused the Data Breach, cybercriminals were able to target Aflac's computer systems and access and exfiltrate Plaintiffs' and Class Members' highly sensitive Private Information, which remains in the hands of those cybercriminals.

10. Aflac had a duty to safeguard and protect the Private Information which was entrusted to it, and Aflac could have prevented the Data Breach by employing reasonably adequate data security measures and protocols to secure this data, as alleged further herein.

11. Reports indicate that a cybercriminal group used social engineering tactics to access Aflac's network and steal files that contained Plaintiffs' and Class Members' claims information,

---

[3] https://www.hipaajournal.com/aflac-data-breach.
[4] https://www.hipaajournal.com/aflac-data-breach.
[5] https://newsroom.aflac.com/2025-12-19-Aflac-updates-June-2025-security-incident.

health information, Social Security numbers, and other Private Information related to customers, beneficiaries, employees, agents, and other individuals in its U.S. business.[6]

12. According to cyber news sources, a ransomware group named Scattered Spider is believed to have accessed Aflac's information network to commit the Data Breach because Scattered Spider was known to be targeting insurance companies in early 2025.[7] However, Aflac has yet to publicly identify the cybercriminal group that accessed its network or confirm whether there was a ransom demand or payment.

13. Because Plaintiffs' and Class Members' Private Information remains in Aflac's possession, Plaintiffs and Class Members have a continuing interest in ensuring that information stored in Aflac's systems is, and remains, safe from further exploitation. To date, Aflac has not provided sufficient details regarding the full scope of the Data Breach, or any details related to the remedial measures it has taken to improve its data security practices and more fully safeguard Plaintiffs' and Class Members' Private Information from future compromise.

14. Aflac maintained the Private Information in a reckless manner and in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information were known risks to Aflac, and, thus, Aflac was on notice that failing to take steps necessary to secure the Private Information from those risks left its network in a dangerous condition and would subject Plaintiffs and Class Members to injury.

15. Because of the highly sensitive and personal nature of the Private Information Aflac acquires and stores, Aflac knew or reasonably should have known that it must comply with healthcare industry standards related to data security and all federal and state laws related to

[6] https://www.cnn.com/2025/06/20/tech/aflac-cyberattack.
[7] https://www.hipaajournal.com/aflac-data-breach.

protecting PII and PHI and provide adequate notice if Private Information is disclosed without proper authorization.

16. Plaintiffs and Class Members provided their Private Information to Aflac as a condition of receiving insurance products and services from Aflac, and in doing so, expected Aflac to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

17. Aflac disregarded Plaintiffs' and Class Members' rights by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to encrypt the Private Information in its network; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to train its IT personnel and staff members on reasonable data security measures; failing to take industry standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach. Aflac acted in bad faith in disregarding the rights of Plaintiffs and Class Members and implementing inadequate data security safeguards and controls, breaching the duty owed to handle Private Information with reasonable care, and failing to maintain the security of consumers' Private Information.

18. Had Aflac properly monitored its computer network and systems and taken the reasonable steps outlined above, it could have prevented the Data Breach, rather than allowing cybercriminals easy access to steal Plaintiffs' and Class Members' Private Information.

19. Plaintiffs' and Class Members' security and identities are now at risk because of Aflac's negligent conduct because their Private Information is now in the hands of data thieves

and, on information and belief, has been sold on the dark web to be misused by other criminals.

20. Armed with the Private Information accessed in the Data Breach, data thieves can and will commit a variety of crimes including: opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in their names, using their information to obtain government benefits, filing fraudulent tax returns using their information, filing false medical claims using their information, obtaining driver's licenses in their names but with another person's photograph, and giving false information to police during an arrest.

21. As a result of the Data Breach, Plaintiffs and Class Members have already suffered substantial harm, including fraudulent transactions in their financial accounts, actual identity theft, reduced credit scores, increasingly invasive spam communications, hours of lost time to remedy the effects of the Data Breach, out of pocket losses, and a heightened and imminent risk of ongoing fraud and identity theft.

22. Plaintiffs and Class Members suffered actual injury the instant their Private Information was accessed and obtained by a third party without their consent or authorization—that being a loss of privacy.

23. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all other similarly situated individuals whose Private Information was accessed in the Data Breach.

24. Accordingly, Plaintiffs bring this action against Aflac seeking redress for its unlawful conduct and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of express contract, (iv) breach of implied contract, (v) unjust enrichment, (vi) violations of the California Consumer Privacy Act ("CCPA"), (vii) violations of California's Confidentiality of Medical information Act ("CMIA"), (viii) declaratory and injunctive relief, (ix) violations of the

Georgia Uniform Deceptive Trade Practices Act ("GUDPTA"), and (x) fees and expenses under O.C.G.A. § 13-6-11, *et seq*.

25. Through this Consolidated Class Action Complaint, Plaintiffs seek remedies on behalf of themselves and all others similarly situated individuals, whose Private Information was compromised in the Data Breach, including, but not limited to, actual damages, consequential damages, nominal damages, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including reasonably sufficient improvements to Aflac's data security systems, future annual audits, as well as long-term and adequate credit and medical monitoring funded by Aflac, and declaratory relief.

**JURISDICTION AND VENUE**

26. This Court has original subject matter jurisdiction pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Members of the Class defined below, and a significant portion of putative Class Members, including all Plaintiffs, are citizens of a different state than Aflac.

27. This Court has general personal jurisdiction over Aflac because Aflac is incorporated in Georgia and maintains its principal place of business in Columbus, Georgia. Aflac also conducts substantial business in Georgia related to Plaintiffs and Class Members and has thereby established minimum contacts with Georgia sufficient to support this Court's exercise of jurisdiction over Aflac.

28. Venue in the Middle District of Georgia is proper pursuant to 28 U.S.C. § 1391(b) because Aflac resides in this District, and a substantial part of the business, events, and omissions giving rise to Plaintiffs' claims occurred in this District, including Aflac collecting, using, and/or storing the Private Information of Plaintiffs and Class Members. In addition, on information and

belief, Plaintiffs' and Class Members' Private Information was maintained within this District.

## PARTIES

### A. Plaintiffs

29. Plaintiff Hilda Abram is a customer of Aflac and has been a citizen and resident of Mississippi at all relevant times and intends to remain domiciled there.

30. Plaintiff Kareen Campbell is a customer of Aflac and has been a citizen and resident of New York at all relevant times and intends to remain domiciled there.

31. Plaintiff Kimberly Cole is a customer of Aflac and has been a citizen and resident of West Virginia at all relevant times and intends to remain domiciled there.

32. Plaintiff Christopher Cook is a customer of Aflac and has been a citizen and resident of Kentucky at all relevant times and intends to remain domiciled there.

33. Plaintiff Alina Forbes-Campbell is a customer of Aflac and has been a citizen and resident of New York at all relevant times and intends to remain domiciled there.

34. Plaintiff Beda Gamboa is a customer of Aflac and has been a citizen and resident of California at all relevant times and intends to remain domiciled there.

35. Plaintiff Eleanor Griffin is a former customer of Aflac and has been a citizen and resident of Illinois at all relevant times and intends to remain domiciled there.

36. Plaintiff Jeffrey Minter is a customer of Aflac and has been a citizen and resident of Virginia at all relevant times and intends to remain domiciled there.

37. Plaintiff Beejay Lukban is a former customer of Aflac and has been a citizen and resident of California at all relevant times and intends to remain domiciled there.

38. Plaintiff Ismael Perez is a customer of Aflac and has been a citizen and resident of Texas at all relevant times and intends to remain domiciled there.

39. Plaintiff Larry Scott is a former customer of Aflac and has been a citizen and resident of Missouri at all relevant times and intends to remain domiciled there.

40. Plaintiff Saralyn Salisbury-Jones is a customer of Aflac and has been a citizen and resident of Maryland at all relevant times and intends to remain domiciled there.

41. Plaintiff Charlene Synoga is a former customer of Aflac and has been a citizen and resident of Illinois at all relevant times and intends to remain domiciled there.

42. Plaintiff Brandon White is a former customer of Aflac and has been a citizen and resident of North Carolina at all relevant times and intends to remain domiciled there.

**B. Defendant Aflac**

43. Aflac is a corporation organized under the laws of the State of Georgia, maintaining its principal place of business at 1932 Wynnton Road, Columbus, Georgia 31999.

## FACTUAL ALLEGATIONS

### I. Aflac's Business and Collection, Use, and Storage of the Private Information

44. Aflac describes itself as "a Fortune 500 company, providing financial protection to millions of policyholders and customers through its subsidiaries in the U.S. and Japan."[8]

45. Aflac claims to have provided coverage to over "50 Million people worldwide."[9]

46. In the ordinary course of providing its insurance products and services, Aflac requires its customers and beneficiaries to provide (and Plaintiffs and Class Members did provide) Aflac with sensitive, Private Information, such as their: name, address, phone number, and email address; date of birth; Social Security number; driver's license number; financial account information, health insurance information; and/or medical information.

47. In the ordinary course of its business, Aflac collects, uses, and stores the Private

---

[8] https://www.aflac.com/about-aflac/default.aspx.
[9] https://www.linkedin.com/company/aflac/about/

Information of its customers, beneficiaries, employees, agents and other individuals.

48. Aflac also creates and stores medical records and other protected health information for its customers, including their records of treatments and diagnoses.

49. On an Aflac webpage, titled Fraud & Security, Aflac represents that "Aflac is fully committed to the security and protection of our customer's data.[10] That same webpage also states:

How We Protect Your Information

- We maintain physical, electronic and procedural safeguards that comply with applicable legal standards to secure such information from unauthorized access and use, accidental or unlawful alteration and destruction, and other unlawful or unauthorized forms of Processing.
- We hold our employees accountable for complying with relevant policies, procedures, rules and regulations concerning the privacy and confidentiality of information.
- Our Global Security team continuously evaluates and enhances how we protect our information using industry best practices.
- Visit Aflac's Trust Center to learn more about how our award-winning Global Security Program protects your information.[11]

50. On another webpage, Aflac represents to its customers in its Privacy Policy that it maintains "technical, physical, and administrative security measures designed to protect the security of your personal information against *loss*, *misuse*, *unauthorized access*, *disclosure*, or alteration. Some of the safeguards we use are firewalls, data encryption, physical access controls

[10] https://www.aflac.com/privacy-center/fraud-and-security.aspx
[11] *Id.*

to our data centers and information access authorization controls."[12]

51. Aflac agreed to and undertook legal duties to maintain the Private Information entrusted to it by Plaintiff and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").[13]

52. Yet, through its failure to properly secure Plaintiffs' and Class Members' Private Information, Aflac  failed to meet its own promises of privacy.

53. Because Aflac collected, used, and stored Plaintiffs' and Class Members' highly sensitive Private Information in Aflac's computer system and network, and it was known that cybercriminal groups were targeting insurance companies in and before 2025[14], the potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known, substantial risk to Aflac , and Aflac was on notice that failing to take steps necessary to secure the Private Information from those risks left its network in a dangerous condition.

54. Aflac and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Aflac properly monitored the network and secured the Private Information it stored, Aflac could have prevented the Data Breach altogether or at least prevented the exfiltration of Private Information.

## II. The Data Breach

55. On or about June 20, 2025, Aflac announced that it experienced a security incident

---

[12] https://www.aflac.com/privacy-center/privacy-policy.aspx#security (emphasis added).
[13] *Id.*; *see also* https://www.aflac.com/docs/about-aflac/hipaa-glba-2017/hipaa-all-states-and-puerto-rico-english.pdf.
[14] https://www.insurancejournal.com/news/national/2025/06/23/828749.htm; https://www.erieinsurance.com/newsroom/press-releases/2025/erie-insurance-network-outage.

on June 12, 2025 disrupting access to its systems.[15]

56. Aflac disclosed that a cybercrime group "used social engineering tactics to gain access to our network. Additionally, we have commenced a review of potentially impacted files, which includes information belonging to customers, beneficiaries, employees, agents, and other individuals in our U.S. business." [16]

57. In other words, Aflac's investigation revealed that its cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of millions of individuals' highly sensitive Private Information.

58. On December 19, 2025, Aflac confirmed that "an unauthorized actor obtained personal information from an Aflac system on June 12, 2025" and that the "files included names, contact information, claims information, health information, social security numbers, and/or other personal information."[17]

59. In December 2025, six months after the Data Breach, Aflac also began sending direct written notice by mail to all impacted individuals, including Plaintiffs and Class Members.[18]

60. As predicted, the Data Breach was vast,[19] with Aflac confirming that approximately 22.65 million individuals' Private Information was impacted in the Data Breach.[20]

61. According to CNN, cybercriminals' social engineering techniques "can involve duping someone into revealing security information to help gain access to a network. It's a hallmark of Scattered Spider attackers, who are known to pose as tech support to infiltrate big

[15] https://investors.aflac.com/press-releases/press-release-details/2025/Aflac-Incorporated-Discloses-Cybersecurity-Incident/default.aspx.
[16] https://investors.aflac.com/press-releases/press-release-details/2025/Aflac-Incorporated-Discloses-Cybersecurity-Incident/default.aspx.
[17] https://www.aflac.com/docs/aflac-cyber-incident-6-24-2025.pdf.
[18] A true and correct copy of Aflac's Notice Letter is attached hereto as **Exhibit A**.
[19] https://www.cnn.com/2025/06/20/tech/aflac-cyberattack.
[20] https://newsroom.aflac.com/2025-12-19-Aflac-updates-June-2025-security-incident.

corporations."[21]

62. Therefore, proper employee training could have prevented the Data Breach.

63. To date, Aflac has provided no public information on a ransom demand or payment.

64. The Data Breach occurred as a direct result of Aflac's failure to implement and follow basic and industry standard security procedures to protect the Private Information belonging to its customers, beneficiaries, employees, agents, and other individuals in Aflac's U.S. business.

65. Aflac's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

66. Aflac's Data Breach was the largest healthcare data breach in 2025— far surpassing any others on the number of individuals impacted, which further warranted robust data security measures given the large swath of Private Information Aflac maintained.[22]

67. Aflac's Data Breach was so worrying to lawmakers that U.S. Senators Bill Cassidy, M.D. (R-LA) and Maggie Hassan (D-NH) wrote to Aflac in August 2025, stating that "additional transparency is needed about whether the intruders accessed private consumer and patient data, how Aflac safeguarded protected health information (PHI) prior to the incident, and steps that the company intends to take going forward."[23]

68. As the Senators wrote, data breaches are not only costly, but "have led to interruptions in health care, including medication errors and delayed patient appointments."[24]

69. Aflac knew or should have known that its electronic records would be targeted by cybercriminals, given the frequency and prevalence of attacks on healthcare and insurance

[22] https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2025/.
[23] https://www.help.senate.gov/rep/newsroom/press/chair-cassidy-hassan-request-information-on-aflac-data-breach-amid-growing-cyberattacks-on-health-sector.
[24] *Id.*

companies and the enormous amount of Private Information Aflac possessed, leading to the need to monitor for exploits and attacks routinely and constantly, and regularly update their software and security procedures.

70. Aflac's obligations were created by HIPAA, the FTCA, the consumer protection statutes cited herein such as the CCPA, CMIA, and GUDTPA, contract, industry standards, common law, and its representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

71. Plaintiffs and Class Members provided their Private Information to Aflac with the reasonable expectation and on the mutual understanding that Aflac would comply with its obligations to keep such information confidential and secure from unauthorized access.

## III. Aflac's Data Security Failures Caused the Data Breach

### A. The Data Breach was a Foreseeable Risk of which Aflac was on Notice

72. It is well known that Private Information, including Social Security numbers and medical information in particular, is a valuable commodity and a frequent, intentional target of cyber criminals. Companies that collect such information, including Aflac, are well-aware of the risk of being targeted by cybercriminals.

73. Individuals place a high value not only on their Private Information, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

74. Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and the healthcare sector. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

75. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[25]

76. Individuals, like Plaintiffs and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers and medical and health information, which are the key to stealing any person's identity and is likened to accessing a person's DNA for hacker's purposes.

77. Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused and medical and health information, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

78. The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other government agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee

[25] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf

you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[26]

79. In 2024, there were a record 3,158 data breaches, similar to the 3,202 breaches reported in 2023. Furthermore, the number of victims affected in 2024 jumped to 1.73 billion people, which is a 300% increase from 2023.[27] This is largely because of a massive data breach at Change Healthcare that affected more than 190 million people.[28]

80. Additionally, "in 2024, healthcare data breaches reached an all-time high, with 276,775,457 records compromised – a 64.1% increase from the previous year's record and equivalent to 81.38% of the United States population." A new report surveyed "more than 2,400 security leaders and found that the top predicted threat for 2025 is ransomware. According to the report, nearly 1 out of every 3 security professionals (38%) believe ransomware will become an even greater threat when powered by AI."[29] This is particularly alarming as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable causes will largely come from businesses "lack of cybersecurity expertise and significant security resources."

81. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, prepared for, and hopefully can ward off a cyberattack.

82. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations

[26] https://www.ssa.gov/pubs/EN-05-10064.pdf
[27] https://www.cnet.com/tech/services-and-software/near-record-number-of-data-breaches-reported-in-2024-report-says/
[28] https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2025/.
[29] https://www.securitymagazine.com/articles/101474-1-in-3-security-leaders-say-ai-will-make-ransomware-a-greater-threat

and the loss of critical information and data."[30] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[31]

83. Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own promises to keep the Private Information private and secure, Aflac failed to take appropriate steps to protect the Private Information of Plaintiffs and the Class Members.

**B. Aflac Could Have Prevented the Data Breach**

84. Aflac did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected from and maintained for Plaintiffs and Class Members, causing the exposure, access, and exfiltration of their Private Information.

85. Aflac could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information and deleting the files of former customers and employees that were no longer needed.

86. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[32]

87. To prevent and detect cyber-attacks and/or ransomware attacks, Aflac could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets,

[30] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware
[31] *Id.*
[32] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including files, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[33]

[33] *Id.* at 3-4.

88. To prevent and detect cyber-attacks or ransomware attacks, Aflac could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely.

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords.

**Apply principle of least privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events.

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[34]

---

[34] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

89. Moreover, Aflac should have trained its employees to detect and avoid social engineering schemes and to promptly report suspicious calls and emails.

90. Given that Aflac was storing the Private Information of its current and former customers, beneficiaries, employees, agents, and other individuals, Aflac could and should have implemented all the above measures to prevent and detect cyberattacks, which could have prevented the Data Breach.

91. The occurrence of the Data Breach shows that Aflac failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in data thieves acquiring the Private Information of millions of individuals, including that of Plaintiffs and Class Members.

**C. Aflac Violated the Federal Trade Commission Act**

92. Aflac is prohibited by the FTCA, 15 U.S.C. § 45, from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.

93. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[35]

94. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.

[35] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf.

95. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

96. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

97. Aflac failed to properly implement basic data security practices. Aflac's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII, or to prevent the disclosure of such information to unauthorized individuals, as reflected by the sensitive Social Security information stolen, constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

98. Aflac was always fully aware of its obligations to protect the PII of customers because of its business of obtaining, collecting, and disclosing PII as well as collecting, storing, and using other confidential personal and financial information. Aflac was also aware of the significant repercussions that would result from its failure to do so.

99. The FTC deems the failure to employ reasonable and appropriate measures to protect against unauthorized access to sensitive personal information an unfair act or practice, prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

100. In 2007, the FTC published guidelines that establish reasonable data security

practices for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies for installing vendor-approved patches to correct security problems. The guidelines also recommend that businesses consider using an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone may be trying to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

101. The FTC has also published a document entitled "FTC Facts for Business," which highlights the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

102. The FTC has issued orders against businesses that have failed to employ reasonable measures to secure sensitive personal information. These orders provide further guidance to businesses regarding their data security obligations.

103. Prior to the Data Breach, and during the breach itself, Aflac failed to follow guidelines set forth by the FTC and actively mishandled the management of its data security.

104. Furthermore, by failing to have reasonable data security measures in place, Aflac engaged in an unfair act or practice within the meaning of Section 5 of the FTCA.

**D. Aflac Violated HIPAA and HITECH**

105. Aflac is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45

C.F.R. Part 160 and Part 164, Subparts A and C.

106. Aflac is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

107. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

108. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

109. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information ["PHI"]." 45 C.F.R. § 164.302.

110. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

111. HIPAA's Security Rule requires Aflac to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic PHI the covered entity or business associate creates, receives, maintains, or transmits.

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information.

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[36]

112. HIPAA also requires Aflac to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Aflac is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

113. HIPAA and HITECH also obligate Aflac to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. §17902.

114. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

115. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

116. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services (HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed

---

[36] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html.

guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[37]. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI."[38]

117. Prior to and during the Data Breach, Aflac failed to comply with these requirements of HIPAA and HITECH and actively mishandled data with inadequate security measures.

**E. Aflac Failed to Comply with Industry Standards**

118. In January 2023, over two years before the attack, the U.S. Department of Health and Human Services created a presentation specifically for healthcare providers and IT departments, warning entities including Aflac of the severe threats posed by cybercriminal groups,[39] demonstrating that within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

119. Several best practices have been identified that, at a minimum, should be implemented by companies in possession of Private Information, like Aflac, including but not limited to: training all employees on cybersecurity; securely configuring business software; managing access controls; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; adopting data encryption while data is both in transit and at rest; multi-factor authentication; deletion of unnecessary sensitive data; backup data and limiting which employees can access sensitive data.

[37] US Department of Health & Human Services, Security Rule Guidance Material.
[38] US Department of Health & Human Services, Guidance on Risk Analysis.
[39] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf

Aflac failed to follow these industry best practices.

120. Other best cybersecurity practices that are standard for companies like Aflac include installing appropriate malware detection software; monitoring and limiting the network ports; monitoring network traffic; protecting web browsers and email management systems; monitoring and protection of physical security systems; protection of telecommunication systems; and training staff regarding critical points of entry by cybercriminals. Aflac failed to follow these cybersecurity best practices.

121. Aflac failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

122. Aflac also failed to meet the minimum standards of the International Organization for Standardization (ISO) and International Electrotechnical Commission (IEC), commonly referred to as the ISO/IEC, the international body that develops standards for information technology and security, including the relevant standard for cybersecurity and data breaches ISO/IEC 27001, stating best practices for establishing, implementing, maintaining, and improving information systems.

123. The foregoing frameworks are existing and applicable industry standards for insurance companies, and upon information and belief, Aflac failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## IV. The Stolen Private Information Is Valuable

124. Aflac, a sophisticated Fortune 500 insurance company, understood that the Private Information it collected and maintained was highly sensitive and of significant value to its owners and those who would use it for wrongful purposes.

125. According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[40]

126. Health and medical records, like those stolen from Aflac, are "often processed and packaged with other illegally obtained data to create full record sets ('fullz') that contain extensive information on individuals, often in intimate detail." [41]

127. The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[42]

128. The purpose of stealing large caches of personal data is to use it to defraud individuals and to place it on the dark web for illegal sale to other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information on anonymous websites, making the information widely available to a criminal underworld. There is an active and robust market for this information.

[40] https://www.hipaajournal.com/why-do-criminals-target-medical-records/
[41] *Id.*
[42] *Id.*

129. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[43]

130. The nature of the Private Information taken in this Data Breach is particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Social Security numbers and health information cannot be easily changed. Even when Social Security numbers are replaced, the process of doing so results in a major inconvenience and expense to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

131. The Social Security Administration (''SSA") warns that the process of replacing a Social Security number is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new

[43] https://www.ahu.edu/blog/data-security-in-healthcare

number may make more difficult for you to get credit.[44]

132. Social Security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often Social Security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

133. Thus, the ramifications of Aflac's failure to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe.

134. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

135. Thus, Aflac knew, or should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its systems were breached. Aflac failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

136. Aflac represented to Plaintiffs and Class Members that Aflac "is fully committed to the security and protection of our customer's data"[45] and that Aflac implemented "technical, physical, and administrative security measures designed to protect the security of your personal

[44] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf
[45] https://www.aflac.com/privacy-center/fraud-and-security.aspx

information against loss, misuse, unauthorized access, disclosure, or alteration."[46]

137. As a highly sophisticated party that handles sensitive Private Information, Aflac failed to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class Members' Private Information to protect against anticipated threats of intrusion of such information.

138. Identity thieves can and will use stolen Private Information for various types of criminal activities, such as credit card fraud, phone or utilities fraud, opening fraudulent bank accounts and loans, identity theft, and government fraud.

139. The Private Information exfiltrated in the Data Breach can also be used to commit identity theft by placing Plaintiffs and Class Members at a higher risk of "phishing," "vishing," "smishing," and "pharming," which are which are other ways for cybercriminals to exploit information they already have in order to get even more personally identifying information from a person through unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

140. There is often a lag time between when fraud occurs and when it is discovered, and also between when Private Information is stolen and when it is used, so the scale of the injuries caused by the Data Breach may not be known for years.

141. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from

[46] *Privacy Policy*, Aflac (Jan. 1, 2023), https://www.aflac.com/privacy-center/privacy-policy.aspx#disclosure

data breaches cannot necessarily rule out all future harm.[47]

142. Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black market for years.

143. Plaintiffs and Class Members rightfully place a high value not only on their PII, but also on the privacy of that data.

144. Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

## V. Aflac Breached its Duties to Plaintiffs and Class Members

145. As an entity collecting, maintaining, and profiting from Plaintiffs' and Class Members' highly sensitive Private Information, Aflac had a duty to exercise reasonable care and comply with applicable industry standards and statutory security requirements to protect their information.

146. Furthermore, because Aflac collected and maintained Plaintiffs' and Class Members' Private Information, and because Aflac was aware its participation in the supplemental insurance industry rendered it—and, by extension, the customers whose data Aflac's aggregated, processed, and maintained—prime targets of cyberattacks, Aflac was under a duty either to lessen the risk that Plaintiffs' and Class Members' Private Information would be subject to a cyberattack, or to see that sufficient precautions were taken to protect Plaintiffs' and Class Members' Private Information from the harm that the risk of a cyberattack posed.

147. As enumerated below, Aflac breached this duty of care to protect sensitive patient Private Information from reasonably foreseeable cyberattacks, including the Data Breach, and to

---

[47] U.S. Gov't Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/new.items/d07737.pdf

see that sufficient precautions were taken to protect against the harm to Plaintiffs and Class Members that cyber threats posed to aggregated and collected Private Information in Aflac's possession.

148. Aflac's specific negligent cybersecurity failures included, *inter alia*:

a. Failing to encrypt all sensitive patient Private Information;

b. Failing to implement hardened firewall rules, to blacklist traffic from and to IP addresses known to be malicious;

c. Failing to implement geo-blocking rules to sufficiently restrict access points into Aflac's server environment, so that, if one area of Aflac's network is compromised, hackers cannot gain access to other portions of Aflac's systems;

d. Failing to enhance password complexity requirements and change administrative-level system accounts' passwords;

e. Failing to install patches to known vulnerabilities;

f. Failing to detect and screen for threats in ingress and egress network traffic from international servers despite that Plaintiffs and Class Members entirely reside within the United States and would not ordinarily check records from outside the United States, and despite the international nature of the organizations and threats faced;

g. Failing to include fail-safe features in its systems that, upon detecting unusual levels of international traffic, would have locked down and insulated their systems—and Plaintiffs' and Class Members' Private Information—from cyber thefts such as the Data Breach;

h. Naming their domains and subdomains in ways that suggested they would likely

contain patient Private Information, rather than storing all sensitive patient Private Information in subdomains with innocuous names;

i. Failing to install sufficient system and security monitoring software across all their servers;

j. Failing to conduct database scanning and securing checks with sufficient frequency;

k. Failing to implement multi-factor authentication across computer systems,, especially where multi-factor authentication is an inexpensive, industry standard, and efficient tool widely available to Aflac to safeguard Plaintiffs' and Class Members' Private Information from cyberthreats, including the Data Breach;

l. Failing to require employees and contractors to change their passwords, and provide account holders with prompts to change their passwords, with sufficient frequency;

m. Failing to require employees to use passwords of sufficient complexity;

n. Failing to provide refresher HIPAA training to its active workforce with sufficient frequency;

o. Failing to implement a threat management program to appropriate monitor Aflac's networks for external threats, and to assess, with sufficient frequency, whether monitoring tools are properly configured, tested, and updated; and

p. Failing to delete and purge the Private Information of Plaintiffs and Class Members no longer needed, such as of former customers, and/or of medical and health information past the statute-of-limitations for disputing a claim.

149. These failures, alone or in combination, constituted breaches of Aflac's duty of

reasonable care to keep patient Private Information safe and secure from known cyberattack threats.

150. Indeed, Defendant was on notice that it was maintaining highly valuable data, which it knew was at risk of being targeted by cybercriminals, and knew of the extensive harm that would occur if Plaintiffs' and Class Members' Private Information was exposed through a data breach.

151. Because Plaintiffs and Class Members provided their Private Information to Aflac, Aflac had a special relationship with Plaintiffs and Class Members which created an independent duty of care. Defendants had a duty to use reasonable security measures because they undertook to collect, store, and use customers' Private Information.

152. Despite holding Private Information for almost more than 22.65 million individuals, Aflac failed to adopt reasonable data security measures to prevent and detect unauthorized access to their highly sensitive databases, putting the highly sensitive Private Information at risk.

153. As such, Aflac failed to properly implement data security practices that were reasonable and up to industry standards.

## VI. The Data Breach Damaged Plaintiffs and Class Members

154. As a result of Aflac's deficient security measures, Plaintiffs and Class Members have been harmed by the compromise, access, and exfiltration of their sensitive Private Information.

155. As a result of the Data Breach, Plaintiffs and Class Members have already suffered fraudulent activity in their financial accounts, fraudulent attempts to open accounts in their names, lowered credit scores, and invasive spam and phishing communications.

156. As a result of the Data Breach, Plaintiffs and Class Members have spent hours of their time and significant effort researching the Data Breach, reviewing and monitoring their accounts for fraudulent activity, signing up for credit monitoring services, and reviewing credit monitoring and scanning reports.

157. Plaintiffs and Class Members highly value the security of their Private Information and entrusted their Private Information to Aflac with the understanding that Aflac would keep their information secure and employ reasonable and adequate security measures to ensure that it would not be compromised.

158. The Data Breach caused Plaintiffs and Class Members immediate injury due to the loss of privacy the moment their Private Information was viewed, accessed, and exfiltrated without their consent or authorization.

159. As a result, the Data Breach has caused Plaintiffs and Class Members to suffer anxiety and stress from concerns that they face an increased risk of financial fraud, identity theft and other types of monetary harm as a result of their Private Information being stolen.

160. Plaintiffs and Class Members have suffered actual damages as a result of the failures of Aflac to adequately protect the sensitive information entrusted to them, including, without limitation, lost time related to monitoring their accounts for fraudulent activity, exposure to increased and imminent risk of fraud and identity theft, actual fraud and identity theft, the loss in value of their Private Information, damaged credit, and other economic and non-economic harm. Plaintiffs and Class Members will now be forced to expend more time on an ongoing basis to review their credit reports and monitor their accounts for fraud and identity theft.

161. As a result of the Data Breach, Plaintiffs and Class Members have been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages

for years to come. Such risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the Private Informaiton compromised by the Data Breach. As alleged above, Plaintiffs and Class Members also continue to suffer from anxiety and fear of a financial fraud and identity theft

162. Plaintiffs and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their Social Security numbers, insurance information, and medical information as a result of the Data Breach, which puts Plaintiffs and Class Members at a high risk of fraud.

163. Many Class Members have incurred and will incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

164. Plaintiffs and Class Members also suffered a "loss of value" in their sensitive Private Information when it was stolen by hackers in the Data Breach. A robust market exists for stolen Private Information. Hackers sell Private Information on the dark web—an underground market for illicit activity, including the purchase of hacked Private Information—at specific identifiable prices. This market serves as a means to determine the loss of value to Plaintiffs and Class Members.

165. Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiffs and Class Members gathered from underground sources, public sources, or even Plaintiffs' and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing telephone calls, text messages, and emails to Plaintiffs and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiffs' and Class

Members' names, taking out loans in Plaintiffs' and Class Members' names, using Plaintiffs' and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs' and Class Members' information, obtaining Social Security numbers in Plaintiffs' and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

166. Plaintiffs' and Class Members also suffered "benefit of the bargain" damages. Plaintiffs and Class Members overpaid for products and services that should have been—but were not—accompanied by adequate data security. Part of the money paid by Plaintiffs and Class Members to Aflac as part of their premiums were intended to be used to fund adequate data security. Plaintiffs and Class Members did not get what they paid for.

167. Plaintiffs and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach. These efforts are burdensome and time-consuming, especially because Aflac has disclosed little information about the Data Breach, forcing customers to continue to monitor their accounts indefinitely.

168. The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

**A. Plaintiffs' Experiences and Injuries**

***Hilda Abram***

169. Plaintiff Hilda Abram obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Abram was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Abram reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

170. Plaintiff Abram regularly takes steps to safeguard her own Private Information within her control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

171. Plaintiff Abram only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Abram reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

172. Plaintiff Abram is a victim of the Data Breach, which exposed her name, contact information, claims information, health information, Social Security number, and/or other personal information.

173. Aflac has begun sending notice letters, including to Plaintiff Abram to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity."[48] Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

174. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Abram suffered injury from a loss of privacy.

175. Plaintiff Abram has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

176. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

177. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Abram, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial

[48] *See* Ex. A.

accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Abram will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

178. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Abram has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web. Notably, since the Data Breach, Plaintiff Abram received monitoring alerts that her credentials, including her Social Security number, were found on the dark web in the fall of 2025.

179. Upon information and belief, Plaintiff Abram's Private Information has already been stolen and misused as a result of the Data Breach, as she has experienced incidents of fraudulent charges and fraudulent attempts to access her accounts in the fall of 2025. Since the Data Breach, Plaintiff Abram's debit card has been compromised and she has had to travel to the bank to dispute the transactions.

180. Plaintiff Abram has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

181. Aflac acknowledged the risk posed to Plaintiff Abram and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection.[49]

182. To date, Plaintiff Abram has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Abram values her privacy and is very

[49] *See* Ex. A.

concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

183. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Abram to suffer stress, fear, and anxiety.

184. Had Plaintiff Abram been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Abram has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Abram anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

185. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Abram faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

186. Plaintiff Abram has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***<u>Kareen Campbell</u>***

187. Plaintiff Kareen Campbell obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Campbell was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Campbell reasonably expected that her Private Information would remain safe and not be

accessed by unauthorized third parties.

188. Plaintiff Campbell regularly takes steps to safeguard her own Private Information within her control. Plaintiff is very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

189. Plaintiff Campbell only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Campbell reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

190. Plaintiff Campbell is a victim of the Data Breach, which exposed her name, contact information, claims information, health information, Social Security number, and/or other personal information.

191. Aflac has begun sending notice letters, including to Plaintiff Campbell to inform her to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity."[50] Despite making these

[50] *See* Ex. A.

recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

192. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Campbell suffered injury from a loss of privacy.

193. Plaintiff Campbell has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

194. Plaintiff Campbell has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

195. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

196. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Campbell, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Campbell will need to continue indefinitely to protect herself

from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

197. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Campbell has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web.

198. Upon information and belief, Plaintiff Campbell's Private Information has already been stolen and misused as a result of the Data Breach, as she has experienced incidents of fraudulent attempts to access her accounts. Notably, following the Data Breach, on two separate occasions, an unauthorized third party applied for a credit card in her name at Barclays Bank. Additionally, an unauthorized third party applied for a credit card at Wells Fargo. These applications have caused Plaintiff Campbell's credit score to drop. In response, Plaintiff Campbell was forced to spend time with the banks dealing with these fraudulent attempts to obtain credit in her name.

199. Aflac acknowledged the risk posed to Plaintiff Campbell and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

200. To date, Plaintiff Campbell has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Campbell values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

201. The substantial risk of imminent harm and loss of privacy have caused Plaintiff

Campbell to suffer stress, fear, and anxiety.

202. Had Plaintiff Campbell been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Campbell has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Campbell anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

203. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Campbell faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

204. Plaintiff Campbell has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Kimberly Cole***

205. Plaintiff Kimberly Cole obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Cole was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Cole reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

206. Plaintiff Cole regularly takes steps to safeguard her own Private Information within her control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive

Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

207. Plaintiff Cole only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Cole reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

208. Plaintiff Cole received a notice letter from Aflac informing her of the Data Breach and the exposure of her Private Information. (Ex. A). The notice letter informed Plaintiff Cole that the Private Information of customers, beneficiaries, employees, agents, and other individuals related to Aflac was involved in the Data Breach. The Private Information compromised in the Data Breach included Plaintiff's name, contact information, claims information, health information, Social Security number, and/or other personal information.

209. The letter advised that Plaintiff Cole take appropriate steps to protect her information. The letter advised Plaintiff Cole to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (Ex. A). Despite making these recommendations to Plaintiff Cole and other

victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

210. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Cole suffered injury from a loss of privacy.

211. Indeed, in early June 2025, Plaintiff Cole attempted to login to her Aflac account and was instead given access to the Aflac account of a different person. This was alarming and impacted Plaintiff's ability to promptly file a claim with Aflac. Plaintiff Cole was forced to spend 8 hours on the phone with Aflac to regain access to her Aflac account.

212. Plaintiff Cole has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

213. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

214. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Cole, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls

and texts, which Plaintiff Cole will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

215. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Cole has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web. Notably, since the Data Breach, Plaintiff Cole received monitoring alerts that her credentials, including her Social Security number, were found on the dark web in the fall of 2025.

216. Upon information and belief, Plaintiff Cole's Private Information has already been stolen and misused as a result of the Data Breach, as she has experienced several incidents of fraudulent charges since June 2025. Specifically, Plaintiff Cole experienced such significant and unusual fraudulent charges that she was forced to replace her debit and credit cards twice since the Data Breach. The fraudulent activity resulted in her credit score dropping. Addressing all of the impacts of Aflac's data breach has cost Plaintiff Cole dozens of hours in lost time.

217. Plaintiff Cole has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

218. Aflac acknowledged the risk posed to Plaintiff Cole and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection.

219. To date, Plaintiff Cole has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Cole values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

220. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Cole to suffer stress, fear, and anxiety.

221. Had Plaintiff Cole been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Cole has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Cole anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

222. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Cole faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

223. Plaintiff Cole has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Christopher Cook***

224. Plaintiff Christopher Cook obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Cook was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff Cook reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

225. Plaintiff Cook regularly takes steps to safeguard his own Private Information within

his own control. Plaintiff is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

226. Plaintiff Cook only allowed Aflac to maintain, store, and use his Private Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff Cook reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

227. Plaintiff Cook is a victim of the Data Breach, which exposed his name, contact information, claims information, health information, Social Security number, and/or other personal information.

228. Aflac has begun sending notice letters, including to Plaintiff Cook, to inform him to take appropriate steps to protect his information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity."[51] Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks

[51] *See* Ex. A.

associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

229. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Cook suffered injury from a loss of privacy.

230. Plaintiff Cook has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

231. Plaintiff Cook has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

232. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

233. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Cook, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Cook will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

234. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Cook has already experienced the effects of the theft of his Private Information and apparent dissemination of his Private Information on the dark web.

235. Upon information and belief, Plaintiff Cook's Private Information has already been stolen and misused as a result of the Data Breach, as he has experienced incidents of fraudulent charges and fraudulent attempts to access his accounts. Notably, following the Data Breach, he had an unauthorized charge on his debit card when an unauthorized third party charged airline tickets. In response, Plaintiff Cook was forced to spend time dealing with the fraudulent charge.

236. Aflac acknowledged the risk posed to Plaintiff Cook and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

237. To date, Plaintiff Cook has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff Cook values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

238. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Cook to suffer stress, fear, and anxiety.

239. Had Plaintiff Cook been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Cook has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Cook anticipates spending considerable time and money on an ongoing basis to try to mitigate and

address the harms caused by the Data Breach.

240. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Cook faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

241. Plaintiff Cook has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Alina Forbes-Campbell***

242. Plaintiff Alina Forbes-Campbell obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Forbes-Campbell was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Forbes-Campbell reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

243. Plaintiff Forbes-Campbell regularly takes steps to safeguard her own Private Information within her own control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

244. Plaintiff Forbes-Campbell only allowed Aflac to maintain, store, and use her

Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Forbes-Campbell reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

245. Plaintiff Forbes-Campbell received a notice letter from Aflac informing her of the Data Breach and the exposure of her Private Information. The Private Information compromised in the Data Breach included Plaintiff's name, contact information, claims information, health information, Social Security numbers, and/or other personal information.

246. The letter advised that Plaintiff Forbes-Campbell take appropriate steps to protect Her information. The letter advised Plaintiff Forbes-Campbell to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to Plaintiff Forbes-Campbell and other victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

247. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Forbes-Campbell suffered injury from a loss of privacy.

248. Despite taking precautionary measures and staying vigilant, as recommended in the

Data Breach notification letter, Plaintiff Forbes-Campbell has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web because Plaintiff Forbes-Campbell has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

249. Plaintiff Forbes-Campbell has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

250. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

251. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Forbes-Campbell, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Forbes-Campbell will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

252. Aflac acknowledged the risk posed to Plaintiff Forbes-Campbell and her Private

Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

253. To date, Plaintiff Forbes-Campbell has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Forbes-Campbell values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

254. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Forbes-Campbell to suffer stress, fear, and anxiety.

255. Had Plaintiff Forbes-Campbell been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Forbes-Campbell has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Forbes-Campbell anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

256. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Forbes-Campbell faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

257. Plaintiff Forbes-Campbell has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***<u>Beda Gamboa</u>***

258. Plaintiff Beda Gamboa obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Gamboa was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Gamboa reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

259. Plaintiff Gamboa regularly takes steps to safeguard her own Private Information within her control. Plaintiff is very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

260. Plaintiff Gamboa only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Gamboa reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

261. Plaintiff Gamboa received a notice letter from Aflac informing her of the Data Breach and the exposure of her Private Information. The notice letter informed Plaintiff Gamboa that the Private Information of customers, beneficiaries, employees, agents, and other individuals

related to Aflac was involved in the Data Breach. The Private Information compromised in the Data Breach included Plaintiff's name, contact information, claims information, health information, Social Security numbers, and/or other personal information.

262. The letter advised that Plaintiff Gamboa take appropriate steps to protect her information. The letter advised Plaintiff Gamboa to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A.) Despite making these recommendations to Plaintiff Gamboa and other victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

263. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Gamboa suffered injury from a loss of privacy.

264. Plaintiff Gamboa has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

265. Plaintiff Gamboa has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

266. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

267. In addition to the actual harm and substantially increased risk of future harm

suffered by Plaintiff Gamboa, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Gamboa will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

268. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Gamboa has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web.

269. Upon information and belief, Plaintiff Gamboa's Private Information has already been stolen and misused as a result of the Data Breach, as she has experienced incidents of fraud. Notably, following the Data Breach, on multiple occasions, an unauthorized person made fraudulent charges in her accounts and attempted to open an account using her PII. Moreover, her cell phone number was deleted without authorization, and she lost access to her phone number for approximately two weeks from late December 2025 through early January 2026. In response, Plaintiff Gamboa was forced to spend time with the banks and phone company addressing this fraudulent activity.

270. Aflac acknowledged the risk posed to Plaintiff Gamboa and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit

monitoring, identity theft protection, and medical fraud protection. (Ex. A).

271. To date, Plaintiff Gamboa has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Gamboa values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

272. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Gamboa to suffer stress, fear, and anxiety.

273. Had Plaintiff Gamboa been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Gamboa has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Gamboa anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

274. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Gamboa faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

275. Plaintiff Gamboa has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Eleanor Griffin***

276. Plaintiff Eleanor Griffin obtained supplemental insurance from Aflac. In order to

receive the supplemental insurance, Plaintiff Griffin was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Griffin reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

277. Plaintiff Griffin regularly takes steps to safeguard her own Private Information within her own control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

278. Plaintiff Griffin only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Griffin reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

279. Plaintiff Griffin is a victim of the Data Breach, which exposed her name, contact information, claims information, health information, Social Security number, and/or other personal information.

280. Aflac has begun sending notice letters, including to Plaintiff Campbell to inform

her to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

281. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Griffin suffered injury from a loss of privacy.

282. Despite taking precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Griffin has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web. Notably, Plaintiff Griffin has experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

283. Plaintiff Griffin has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

284. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

285. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Griffin, she has taken precautions to mitigate the risk of future identity theft

and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Griffin will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

286. Aflac acknowledged the risk posed to Plaintiff Griffin and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

287. To date, Plaintiff Griffin has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Griffin values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

288. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Griffin to suffer stress, fear, and anxiety.

289. Had Plaintiff Griffin been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Griffin has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Griffin anticipates spending considerable time and money on an ongoing basis to try to mitigate and

address the harms caused by the Data Breach.

290. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Griffin faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

291. Plaintiff Griffin has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Beejay Lukban***

292. Plaintiff Beejay Lukban obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Lukban was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff Lukban reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

293. Plaintiff Lukban regularly takes steps to safeguard his own Private Information within his own control. Plaintiff is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

294. Plaintiff Lukban only allowed Aflac to maintain, store, and use his Private

Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff Lukban reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

295. Plaintiff Lukban received a notice letter from Aflac informing him of the Data Breach and the exposure of his Private Information. The notice letter informed Plaintiff Lukban that the Private Information of customers, beneficiaries, employees, agents, and other individuals related to Aflac was involved in the Data Breach. The Private Information compromised in the Data Breach included Plaintiff's name, contact information, claims information, health information, Social Security number, and/or other personal information.

296. The letter advised that Plaintiff Lukban take appropriate steps to protect his information. The letter advised Plaintiff Lukban to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (Ex. A). Despite making these recommendations to Plaintiff Lukban and other victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

297. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Lukban suffered injury from a loss of privacy.

298. Despite taking precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Lukban has already experienced the effects of the theft of

his Private Information and apparent dissemination of his Private Information on the dark web. Notably, Plaintiff Lukban has experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

299. Plaintiff Lukban has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

300. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

301. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Lukban, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Lukban will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

302. Aflac acknowledged the risk posed to Plaintiff Lukban and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit

monitoring, identity theft protection, and medical fraud protection. (Ex. A).

303. To date, Plaintiff Lukban has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff Lukban values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

304. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Lukban to suffer stress, fear, and anxiety.

305. Had Plaintiff Lukban been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Lukban has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Lukban anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

306. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Lukban faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

307. Plaintiff Lukban has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Jeffrey Minter***

308. Plaintiff Jeffrey Minter obtained supplemental insurance from Aflac. In order to

receive the supplemental insurance, Plaintiff Minter was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff Minter reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

309. Plaintiff Minter regularly takes steps to safeguard his own Private Information within his own control. Plaintiff is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

310. Plaintiff Minter only allowed Aflac to maintain, store, and use his Private Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff Minter reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

311. Plaintiff Minter is a victim of the Data Breach, which exposed his name, contact information, claims information, health information, Social Security number, and/or other personal information.

312. Aflac has begun sending notice letters, including to Plaintiff Minter to inform him

to take appropriate steps to protect his information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

313. In the instant that his Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Minter suffered injury from a loss of privacy.

314. Plaintiff Minter has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

315. Plaintiff Minter has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

316. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

317. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Minter, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring his financial

accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Minter will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

318. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Minter has already experienced the effects of the theft of his Private Information and apparent dissemination of his Private Information on the dark web.

319. Upon information and belief, Plaintiff Minter's Private Information has already been stolen and misused as a result of the Data Breach, as he has experienced incidents of fraudulent charges and fraudulent attempts to access his accounts. Notably, following the Data Breach, he experienced numerous fraudulent charges on his credit cards, only some of which were reversed. In response, Plaintiff Minter was forced to spend time with the banks to address these fraudulent charges and changed all of his bank cards.

320. Aflac acknowledged the risk posed to Plaintiff Minter and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

321. To date, Plaintiff Minter has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff Minter values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

322. The substantial risk of imminent harm and loss of privacy have caused Plaintiff

Minter to suffer stress, fear, and anxiety.

323. Had Plaintiff Minter been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Minter has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Minter anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

324. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Minter faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

325. Plaintiff Minter has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***<u>Ismael Perez</u>***

326. Plaintiff Ismael Perez obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Perez was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff Perez reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

327. Plaintiff Perez regularly takes steps to safeguard his own Private Information within his own control. Plaintiff is a cautious person and is therefore very careful about sharing his

sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

328. Plaintiff Perez only allowed Aflac to maintain, store, and use his Private Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff Perez reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

329. Plaintiff Perez is a victim of the Data Breach, which exposed his name, contact information, claims information, health information, Social Security number, and/or other personal information.

330. Aflac has begun sending notice letters, including to Plaintiff Perez to inform him to take appropriate steps to protect his information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

331. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Perez suffered injury from a loss of privacy.

332. Despite taking precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Perez has already experienced the effects of the theft of his Private Information and apparent dissemination of his Private Information on the dark web. Notably, Plaintiff Perez has experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

333. Plaintiff Perez has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

334. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

335. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Perez, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring his financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Perez will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured,

was spent at Aflac's direction.

336. Aflac acknowledged the risk posed to Plaintiff Perez and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

337. To date, Plaintiff Perez has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff Perez values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

338. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Perez to suffer stress, fear, and anxiety.

339. Had Plaintiff Perez been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Perez has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Perez anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

340. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Perez faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

341. Plaintiff Perez has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded

from future breaches.

***Larry Scott***

342. Plaintiff Larry Scott obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Scott was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff Scott reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

343. Plaintiff Scott regularly takes steps to safeguard his own Private Information within his own control. Plaintiff is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

344. Plaintiff Scott only allowed Aflac to maintain, store, and use his Private Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff Scott reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

345. Plaintiff Scott is a victim of the Data Breach, which exposed his name, contact

information, claims information, health information, Social Security number, and/or other personal information.

346. Aflac has begun sending notice letters, including to Plaintiff Scott to inform him to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

347. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff Scott suffered injury from a loss of privacy.

348. Despite taking precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Scott has already experienced the effects of the theft of his Private Information and apparent dissemination of his Private Information on the dark web. Notably, Plaintiff Scott has experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

349. Plaintiff Scott has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was made accessible to and exfiltrated by cybercriminals.

350. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result

of Aflac's misconduct.

351. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Scott, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring his financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Scott will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

352. Aflac acknowledged the risk posed to Plaintiff Scott and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

353. To date, Plaintiff Scott has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff Scott values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

354. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Scott to suffer stress, fear, and anxiety.

355. Had Plaintiff Scott been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Scott has already suffered injury and remains at a

substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Scott anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

356. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Scott faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

357. Plaintiff Scott has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Saralyn Salisbury-Jones***

358. Plaintiff Salisbury-Jones obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Salisbury-Jones was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Salisbury-Jones reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

359. Plaintiff Salisbury-Jones regularly takes steps to safeguard her own Private Information within her own control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as

protected as it can be.

360. Plaintiff Salisbury-Jones only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Salisbury-Jones reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

361. Plaintiff Salisbury-Jones is a victim of the Data Breach, which exposed her name, contact information, claims information, health information, Social Security number, and/or other personal information.

362. Aflac has begun sending notice letters, including to Plaintiff Salisbury-Jones to inform her to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

363. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Salisbury-Jones suffered injury from a loss of privacy.

364. Plaintiff Salisbury-Jones has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

365. Plaintiff Salisbury-Jones has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

366. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

367. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Salisbury-Jones, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Salisbury-Jones will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

368. Despite taking these precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Salisbury-Jones has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web. Notably, since the Data Breach, Plaintiff Salisbury-Jones received monitoring alerts that her credentials, including email, were found on the dark web.

369. Aflac acknowledged the risk posed to Plaintiff Salisbury-Jones and her Private

Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

370. To date, Plaintiff Salisbury-Jones has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Salisbury-Jones values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

371. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Salisbury-Jones to suffer stress, fear, and anxiety.

372. Had Plaintiff Salisbury-Jones been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Salisbury-Jones has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Salisbury-Jones anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

373. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Salisbury-Jones faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

374. Plaintiff Salisbury-Jones has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Charlene Synoga***

375. Plaintiff Charlene Synoga obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff Synoga was required to provide and entrust Aflac with her Private Information. When providing and entrusting Aflac with her Private Information, Plaintiff Synoga reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

376. Plaintiff Synoga regularly takes steps to safeguard her own Private Information within her own control. Plaintiff is a cautious person and is therefore very careful about sharing her sensitive Private Information. As a result, she has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing her Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for her various online accounts, changing and refreshing them as needed to ensure her information is as protected as it can be.

377. Plaintiff Synoga only allowed Aflac to maintain, store, and use her Private Information because she believed Aflac would use basic security measures to protect her Private Information, such as requiring passwords and multi-factor authentication to access databases storing her Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with her Private Information, Plaintiff Synoga reasonably expected that her Private Information would remain safe and not be accessed by unauthorized third parties.

378. Plaintiff Synoga is a victim of the Data Breach, which exposed her name, contact information, claims information, health information, Social Security number, and/or other personal

information.

379. Aflac has begun sending notice letters, including to Plaintiff Synoga to inform her to take appropriate steps to protect her information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

380. In the instant that her Private Information was accessed and obtained by a third party without her consent or authorization, Plaintiff Synoga suffered injury from a loss of privacy.

381. Despite taking precautionary measures and staying vigilant, as recommended in the Data Breach notification letter, Plaintiff Synoga has already experienced the effects of the theft of her Private Information and apparent dissemination of her Private Information on the dark web because Plaintiff Synoga has also experienced a drastic increase in spam emails, texts, and telephone calls as a result of the Data Breach.

382. Plaintiff Synoga has been further injured by the damages to and loss in value of her Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when her Private Information was made accessible to and exfiltrated by cybercriminals.

383. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of her Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

384. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff Synoga, she has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced her to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, self-monitoring her financial accounts and credit reports to ensure no fraudulent activity has occurred, and blocking spam calls and texts, which Plaintiff Synoga will need to continue indefinitely to protect herself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

385. Aflac acknowledged the risk posed to Plaintiff Synoga and her Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

386. To date, Plaintiff Synoga has spent time on efforts to address and protect herself from harm resulting from the Data Breach. Plaintiff Synoga values her privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

387. The substantial risk of imminent harm and loss of privacy have caused Plaintiff Synoga to suffer stress, fear, and anxiety.

388. Had Plaintiff Synoga been informed of Aflac's insufficient data security measures to protect her Private Information, she would not have willingly provided her Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff Synoga has already suffered injury and remains at

a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff Synoga anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

389. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff Synoga faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

390. Plaintiff Synoga has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

***Brandon White***

391. Plaintiff Brandon White obtained supplemental insurance from Aflac. In order to receive the supplemental insurance, Plaintiff White was required to provide and entrust Aflac with his Private Information. When providing and entrusting Aflac with his Private Information, Plaintiff White reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

392. Plaintiff White regularly takes steps to safeguard his own Private Information within his own control. Plaintiff is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure her information is as protected

as it can be.

393. Plaintiff White only allowed Aflac to maintain, store, and use his Private Information because he believed Aflac would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Aflac at the time of the Data Breach. When providing and entrusting Aflac with his Private Information, Plaintiff White reasonably expected that his Private Information would remain safe and not be accessed by unauthorized third parties.

394. Plaintiff White is a victim of the Data Breach, which exposed his name, contact information, claims information, health information, Social Security number, and/or other personal information.

395. Aflac has begun sending notice letters, including to Plaintiff White to inform him to take appropriate steps to protect his information. The letter advises to "remain vigilant against attempts at identity theft or fraud, which includes reviewing credit reports, financial accounts, and insurance statements for suspicious activity." (*See* Ex. A). Despite making these recommendations to victims of the Data Breach, Aflac itself was not vigilant in protecting against the foreseeable risks associated with its maintenance and storage of the highly sensitive information entrusted to it. Aflac's lack of vigilance and care directly led to the Data Breach.

396. In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff White suffered injury from a loss of privacy.

397. Plaintiff White has been further injured by the damages to and loss in value of his Private Information—a form of intangible property that Plaintiff entrusted to Aflac. This information has inherent value that Plaintiff was deprived of when his Private Information was

made accessible to and exfiltrated by cybercriminals.

398. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse of his Private Information, which is now in the hands of criminals, as a direct and proximate result of Aflac's misconduct.

399. In addition to the actual harm and substantially increased risk of future harm suffered by Plaintiff White, he has taken precautions to mitigate the risk of future identity theft and fraud as Aflac advised. The Data Breach has forced him to spend significant time and energy dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter, researching the details of the Data Breach, and self-monitoring his financial accounts and credit reports to ensure no fraudulent activity has occurred, which Plaintiff White will need to continue indefinitely to protect himself from harm resulting from the Data Breach. This time, which has been lost forever and cannot be recaptured, was spent at Aflac's direction.

400. Aflac acknowledged the risk posed to Plaintiff White and his Private Information as a result of the Data Breach, both by explicitly stating that "[w]e take the privacy and security of information seriously" and by offering 24 months of CyEx Medical Shield, which includes credit monitoring, identity theft protection, and medical fraud protection. (Ex. A).

401. To date, Plaintiff White has spent time on efforts to address and protect himself from harm resulting from the Data Breach. Plaintiff White values his privacy and is very concerned about identity theft and the consequences of such theft and fraud resulting from the Data Breach.

402. The substantial risk of imminent harm and loss of privacy has caused Plaintiff White to suffer stress, fear, and anxiety.

403. Had Plaintiff White been informed of Aflac's insufficient data security measures to protect his Private Information, he would not have willingly provided his Private Information to Aflac. Given the highly sensitive nature of the Private Information stolen, and its subsequent dissemination to unauthorized parties, Plaintiff White has already suffered injury and remains at a substantial and imminent risk of future harm. As a result of the Data Breach, Plaintiff White anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

404. Given the nature of the information exposed in the Data Breach and the propensity of criminals to use such information to commit a wide variety of financial crimes, Plaintiff White faces a significant present and ongoing risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

405. Plaintiff White has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Aflac's possession, is protected, and safeguarded from future breaches.

## **CLASS ACTION ALLEGATIONS**

406. Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and (b)(3) on behalf of the following Classes:

**Nationwide Class**

> All individuals who are current or former Aflac customers or beneficiaries of customers residing in the United States whose Private Information was compromised in the Data Breach, including all people who were sent notice of the Data Breach.

**California Subclass**

> All individuals who are current or former Aflac customers or beneficiaries of customers residing in California whose Private Information was compromised as a result of the Data Breach, including all California residents who were sent notice of the Data Breach.

407. Excluded from the Classes are Defendant, its subsidiaries and affiliates, its officers, directors, employees, and members of their immediate families and any entity in which Aflac has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

408. Plaintiffs reserve the right to modify, expand or amend the above definitions of the Classes or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

409. Certification of Plaintiffs' claims for class-wide treatment are appropriate because all elements of Fed. R. Civ. P. 23(a), (b)(2)-(3), and (c)(4) are satisfied. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

410. **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. Aflac has represented the Data Breach impacts over 22.65 million individuals. The exact size of the Classes and the identities of the individual members thereof are ascertainable through Aflac's records, including but not limited to, the files implicated in the Data Breach.

411. **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

a. Whether Aflac engaged in the misconduct alleged herein;

b. Whether Aflac owed a duty to Class Members to safeguard their sensitive Private

Information;

c. Whether Aflac failed to implement and maintain reasonable security procedures and monitoring practices appropriate for the nature and scope of the information compromised in the Data Breach;

d. Whether Aflac breached its duty to Class Members to safeguard their sensitive Private Information;

e. Whether Aflac's conduct violated the FTCA, HIPAA and HITECH;

f. Whether Aflac's data security systems and monitoring processes prior to and during the Data Breach complied with applicable law and were consistent with industry standards;

g. Whether Aflac knew or should have known its network and systems were susceptible to a data breach;

h. Whether Aflac breached implied contracts with Plaintiffs and Class Members;

i. Whether Aflac was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

j. Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach; and

k. Whether Aflac's failure to provide adequate security proximately caused Plaintiffs' and Class Members' injuries.

412. **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of all Class Members because Plaintiffs, like other Class Members, suffered theft of their sensitive Private Information in the Data Breach.

413. **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class Representative because they are Members of the Class and their interests do not conflict with the interests of other Class Members that they seek to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and

their counsel will fairly and adequately protect the Class's interests.

414. **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Classes' claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Aflac, so it would be impracticable for Members of the Class to individually seek redress for Aflac's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

415. The litigation of the claims brought herein is manageable. Aflac's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Aflac's records.

416. Particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests. Such particular issues are set forth above.

417. **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Aflac has acted, or refused to act, on grounds generally applicable to the Classes such that certification of the Classes, final declaratory and injunctive relief are appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Nationwide Class)

418. Plaintiffs re-allege and incorporate by reference all allegations in paragraphs 1 through 435 as if fully set forth herein.

419. Aflac requires its customers, beneficiaries, employees, agents, and other individuals, including Plaintiffs and Class Members, to submit non-public Private Information in the ordinary course of providing its insurance products and services and employing individuals and contracting with agents.

420. Aflac collected, used, and stored the Private Information of Plaintiffs and Class Members in the ordinary course of its business.

421. Plaintiffs and Class Members entrusted Aflac with their Private Information with the understanding that Aflac would safeguard their information.

422. Aflac had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed.

423. By voluntarily undertaking and assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Aflac owed common

law negligence duties of care to Plaintiffs and Class Members to use reasonable means to secure, safeguard, and delete Plaintiffs' and Class Members' Private Information, to prevent disclosure of the information, and to safeguard the information from theft.

424. Those duties included, among other things: (a) regularly designing, maintaining, and testing Aflac's security systems to ensure that Plaintiffs' and Class Members' Private Information in Aflac's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards, including regularly updating, patching, and evaluating security measures.

425. Aflac's duty is not a blanket duty owed to all the world, but rather Aflac's duty is derived from common law, statutory law, and industry standards and included a responsibility to implement processes by which it could promptly detect a foreseeable breach of its security systems, including adequate training or hiring of IT professionals, stopping a breach, and giving prompt and complete notice to those affected by a data breach.

426. Aflac had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiffs and Class Members were within the class of persons the Federal Trade Commission Act was intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statute was intended to guard against.

427. Aflac's duty to use reasonable security measures under HIPAA required Aflac to

"reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

428. Aflac owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, HIPAA, and other requirements alleged in this Complaint, and to ensure that its systems and networks adequately protected the Private Information.

429. Aflac's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Aflac and Plaintiffs and Class Members. That special relationship arose because Plaintiffs and Class Members entrusted Aflac with their confidential Private Information, a necessary part of being customers or employees of Aflac.

430. Aflac was subject to the above independent duties, untethered to any contract between Aflac and Plaintiffs or the Class.

431. Aflac also had a duty to exercise appropriate clearinghouse practices to delete former customers' and beneficiaries' Private Information it no longer needed to retain pursuant to regulations.

432. Moreover, Aflac had a duty to promptly and adequately notify Plaintiffs and Class Members of the Data Breach.

433. Timely, adequate notification was required, appropriate, and necessary so that, among other things, Plaintiffs and Class Members could take appropriate measures to freeze or lock their credit profiles; avoid unauthorized charges to their credit or debit card accounts; cancel or change usernames and passwords on compromised accounts; monitor their account information

and credit reports for fraudulent activity; contact their banks or other financial institutions that issue their credit or debit cards; obtain credit monitoring services; contact their health insurers or governmental health insurance providers; and take other steps to mitigate or ameliorate the damages caused by Aflac's misconduct. Aflac was the only entity that had sufficient knowledge to properly provide this notice.

434. Aflac had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Aflac's possession was compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiffs and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

435. Aflac breached these duties and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Aflac include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information.

b. Failing to adequately monitor the security of its networks and systems.

c. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information.

d. Failing to timely detect that Plaintiffs' and Class Members' Private Information had been compromised.

e. Failing to remove Private Information it no longer needed to retain pursuant to contracts and regulations; and

f. Failing to timely and adequately notify Plaintiffs and Class Members about the Data

Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

436. Aflac violated Section 5 of the FTCA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Aflac's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and Class Members. Aflac's violation of Section 5 of the FTCA constitutes negligence.

437. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

438. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of Aflac's inadequate security practices and the known high frequency of cyberattacks and data breaches in the insurance industry.

439. Aflac has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed.

440. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures by Aflac, and Aflac knew or should have known of the inherent risks in collecting and storing the Private Information, the critical importance of providing adequate security of that Private Information, and the necessity of encrypting Private Information stored on Aflac's systems or transmitted through third-party systems.

441. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in one or more types of injuries to Class Members.

442. Plaintiffs and Class Members had no ability to protect their Private Information that was and remains in Aflac's possession.

443. Aflac was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

444. Aflac's duty extended to protecting Plaintiffs and Class Members from the risk of the foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

445. Aflac has admitted that the Private Information of Plaintiffs and Class Members was disclosed to unauthorized third persons as a result of the Data Breach.

446. But for Aflac's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

447. There is a close causal connection between Aflac's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was accessed and exfiltrated as the proximate result of Aflac's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and

maintaining appropriate security measures.

448. As a direct and proximate result of Aflac's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) an invasion and loss of privacy; (ii) fraud and identity theft resulting from the theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain as to customers and beneficiaries; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Aflac's possession and is subject to further unauthorized disclosures so long as Aflac fails to undertake appropriate and adequate measures to protect the Private Information.

449. Additionally, as a direct and proximate result of Aflac's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Aflac's possession and is subject to further unauthorized disclosures as long as Aflac fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

450. Plaintiffs and Class Members are entitled to nominal, compensatory, and consequential damages suffered as a result of the Data Breach.

451. Plaintiffs and Class Members are also entitled to injunctive relief requiring Aflac to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) to provide adequate credit monitoring to all Class Members.

**COUNT II**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiffs and the Nationwide Class)**

452. Plaintiffs re-allege and incorporate by reference all allegations in paragraphs 1 through 435 as if fully set forth herein

453. Section 5 of the FTCA, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies, such as Aflac, of failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Aflac's duty.

454. Pursuant to the FCTA, 15 U.S.C. § 45, Aflac had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

455. Aflac violated Section 5 of the FTCA by failing to use reasonable measures to protect Private Information and by failing to comply with applicable industry standards, as described in detail herein. Aflac's conduct was particularly unreasonable given the nature and amount of Private Information it collected and stored and the foreseeable consequences and immense damages that would result to Plaintiffs and Class Members.

456. Plaintiffs and Class Members are within the class of persons that the FTCA was intended to protect.

457. Pursuant to HIPAA, 42 U.S.C. § 1302d, et seq., Aflac had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

458. Pursuant to HIPAA, Aflac had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is

a low probability of assigning meaning without use of a confidential process or key."[52]

459. Aflac breached its duties to Plaintiffs and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, and adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information.

460. Moreover, the harm that has occurred is the type of harm that the FTCA intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

461. Aflac's failure to comply with applicable laws and regulations, including the FTCA and HIPAA, constitutes negligence *per se*.

462. But for Aflac's wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

463. There is a close causal connection between Aflac's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as a proximate result of Aflac's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures, as detailed above.

464. The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Aflac's breach of its duties. Aflac knew or should have known that it failed to meet its duties, and that Aflac's breach would cause Plaintiffs and Class Members to experience

[52] *See* definition of encryption at 45 C.F.R. § 164.304.

the foreseeable harms associated with the exposure of their Private Information.

465. As a direct and proximate result of Aflac's negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer significant injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, fraud, identity theft, increased risk of imminent fraud and identity theft, and other economic and non-economic losses.

466. As a direct and proximate result of Aflac's negligence *per se*, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

467. Aflac's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

468. Plaintiffs and Class Members are also entitled to injunctive relief requiring Aflac to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiffs and the Nationwide Class)

469. Plaintiffs re-allege and incorporate by reference all allegations in paragraphs 1 through 435 as if fully set forth herein.

470. This count is alleged in the alternative to Count IV alleged herein.

471. When Plaintiffs and Class Members provided their sensitive Private Information to Aflac they entered into implied contracts with Aflac under which Aflac agreed to take reasonable

steps to protect their sensitive Private Information.

472. Aflac solicited and invited Plaintiffs and Class Members to provide their sensitive Private Information as part of their regular business practices.

473. Aflac requires customers to provide sensitive Private Information, to obtain and maintain Aflac's products and services.

474. Plaintiffs and Class Members accepted Aflac's offers and provided their sensitive Private Information Aflac.

475. Plaintiffs and Class Members reasonably believed and expected that Aflac's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Aflac.

476. Plaintiffs and Class Members paid money (directly and/or indirectly) to Aflac, and Plaintiffs and Class Members therefore reasonably believed and expected that Aflac would use part of those funds to obtain and oversee adequate data security. Aflac refused to do so.

477. Plaintiffs and Class Members would not have provided their sensitive Private Information to Aflac in the absence of Aflac's implied promise to keep their sensitive Private Information reasonably secure.

478. Aflac breached its implied contracts with Plaintiffs and Class Members by failing to maintain adequate measures to safeguard, secure, and protect Plaintiffs' and Class Members' Private Information.

479. As a direct and proximate result of Aflac's breaches of the implied contracts, Plaintiffs and Class Members have been injured as alleged herein. Plaintiffs and Class Members are entitled to damages, including actual, compensatory, punitive, and nominal damages suffered because of the Data Breach in an amount to be proven at trial.

480. Plaintiffs and Class Members are also entitled to injunctive relief requiring Aflac to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free and adequate credit monitoring and identity theft insurance to all Class Members for the remainder of their lives.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

481. Plaintiffs re-allege and incorporate by reference all allegations in paragraphs 1 through 435 as if fully set forth herein.

482. Plaintiffs bring this claim in the alternative to their breach of implied contract claim above.

483. Plaintiff and Class Members conferred a direct monetary benefit on Aflac by way of providing Aflac with their valuable Private Information and paying for supplemental insurance benefits.

484. Aflac failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members.

485. Aflac enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

486. Instead of providing a reasonable level of security that would have prevented the Data Breach, Aflac instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members suffered as a direct and proximate result of Aflac's failure to provide the requisite data security.

487. Under principles of equity and good conscience, Aflac should not be permitted to

retain the full value of Plaintiffs' and Class Members' Private Information because Aflac failed to provide adequate safeguards and security measures that are mandated by industry standards to protect Plaintiffs' and Class Members' Private Information.

488. Aflac acquired the monetary benefit and Private Information of Plaintiffs and Class Members through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

489. Aflac wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

490. Aflac's enrichment at the expense of Plaintiffs and Class Members is and was unjust. Had Plaintiffs and Class Members known that Aflac had not secured their Private Information, they would not have agreed to provide their Private Information to Aflac.

491. Aflac also knew that Plaintiffs and Class Members expected that their information would be kept secure against known security risks. And based on this expectation and trust, Aflac knew that Plaintiffs and Class Members would not have disclosed their sensitive information to them.

492. Aflac's defective security and their unfair and deceptive conduct have, among other things, caused Plaintiffs and Class Members to unfairly incur substantial time and/or costs to mitigate and monitor the use of their Private Information.

493. Plaintiffs and Class Members have no adequate remedy at law.

494. As a direct and proximate result of Aflac's conduct, Plaintiffs and Class Members suffered—and will continue to suffer—other forms of injury and/or harm.

495. Aflac's conduct caused Plaintiffs and Class Members to suffer damages as alleged herein.

496. Aflac should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**VIOLATIONS OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA"), CAL. CIV. CODE § 1798.150**
**(On behalf of Plaintiffs Lukban and Gamboa and the California Subclass)**

497. Plaintiffs Lukban and Gamboa ("California Plaintiffs"), individually and on behalf of the California Subclass, re-allege and incorporate by reference the allegations of paragraphs 1 through 435above, as if fully set forth herein.

498. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA, providing:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:
>
> (A) To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
>
> (B) Injunctive or declaratory relief.
>
> (C) Any other relief the court deems proper.

499. Aflac is a "business" under the meaning of Civil Code § 1798.140 because Aflac is a "corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners" that "collects consumers' personal information" and is active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year." Civil Code §

1798.140(d).

500. Aflac Defendant determines the purposes and means of processing consumers' Private Information. Aflac uses consumers' personal data to provide products and services at consumers' requests, as well as to develop, improve, and test Aflac's products and services.

501. California Plaintiffs and California Subclass Members are California residents and covered "consumers" under the CCPA, whose personal information, as defined by Civil Code section 1798.140(v)(1), was subject to unauthorized access and exfiltration, theft, and disclosure. The Data Breach described herein exposed, without limitation, names, contact information, health information, and Social Security numbers.

502. Aflac violated California Civil Code § 1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted and nonredacted Private Information of California Plaintiffs and the California Subclass. As a direct and proximate result, California Plaintiffs' and the California Subclass Members' nonencrypted and nonredacted Private Information was subject to unauthorized access and exfiltration, theft, and disclosure.

503. Aflac knew or should have known that its data security practices were inadequate to secure California Plaintiffs' and California Subclass Members' Private Information and that its inadequate data security practices gave rise to the risk of a data breach.

504. Aflac failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the Private Information it collected, stored and processed.

505. Aflac stored and maintained California Plaintiffs' and California Subclass Members' Private Information in a form that allowed criminals to access it.

506. The cybercriminals accessed "nonencrypted and unredacted Private Information"

as covered by Cal. Civ. Code § 1798.81.5(A)(1)(d), in the Data Breach.

507. Aflac violated the CCPA, Cal. Civ. Code § l798.150(a), by failing to prevent California Plaintiffs' and California Subclass Members' Private Information from unauthorized access and exfiltration, theft, or disclosure.

508. California Plaintiffs and California Subclass Members seek injunctive or other equitable relief to ensure Aflac hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Aflac continues to maintain Private Information, including California Plaintiffs' and California Subclass Members' Private Information, in an insecure manner. California Plaintiffs and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected, and Aflac has demonstrated a pattern of failing to adequately safeguard this information.

509. As a direct and proximate result of Aflac's violation of its duty, California Plaintiffs' and California Subclass Members' Private Information was subjected to unauthorized access, exfiltration, theft, and disclosure to criminals and on the dark web.

510. As a direct and proximate result of Aflac's acts, California Plaintiffs and California Subclass Members were injured and lost money or property, including but not limited to the loss of their legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

511. On January 6 ,2026, Plaintiff Lukban sent Aflac written notice of its violations of Cal. Civ. Code § 1798.150(a) and the notice further demanded that such violations be cured, pursuant to Cal. Civ. Code § 1798.150(b).[53] Because Aflac has neither cured the noticed violation

[53] Aflac waived the 30-day pre-suit notice waiting period but reserved all rights to assert any defenses to Plaintiff Lukban's individual CCPA claims.

nor provided Plaintiff Lukban with an express written statement that the violations have been cured and that no further violations shall occur, California Plaintiffs and California Subclass Members seek statutory damages pursuant to Cal. Civil Code § 1798.150(a)(1)(A).

512. On January 12 ,2026, Plaintiff Gamboqa sent Aflac written notice of its violations of Cal. Civ. Code § 1798.150(a) and the notice further demanded that such violations be cured, pursuant to Cal. Civ. Code § 1798.150(b).[54] Because Aflac has neither cured the noticed violation nor provided Plaintiff Lukban with an express written statement that the violations have been cured and that no further violations shall occur, California Plaintiffs and California Subclass Members seek statutory damages pursuant to Cal. Civil Code § 1798.150(a)(1)(A).

513. Consequently, California Plaintiffs seek actual damages and statutory damages of no less than $100 and up to $750 per record subjected to the Data Breach on behalf of the California Subclass as authorized by the CCPA.

514. Accordingly, California Plaintiffs and California Subclass Members by way of this Complaint seek actual damages, statutory damages, and injunctive relief pursuant to Cal. Civ. Code § 1798.150(a) as a result of Aflac's violations described herein.

## COUNT VI
## VIOLATIONS OF CALIFORNIA'S CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA"), CAL. CIV. CODE § § 56, ET SEQ.
## (On behalf of Plaintiff Lukban and the California Subclass)

515. California Plaintiffs incorporate by reference the allegations in paragraphs 1-435 as if fully set forth herein.

516. California's Confidentiality of Medical Information Act ("CMIA"), provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical

[54] Aflac waived the 30-day pre-suit notice waiting period but reserved all rights to assert any defenses to Plaintiff Lukban's individual CCPA claims.

information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization[.]" Cal. Civ. Code § 56.10(a).

517. The CMIA prohibits, among other things, unauthorized disclosure of private medical information. Cal. Civ. Code §§ 56, *et seq.*

518. Aflac is a provider of a "health care service plan" and a "contractor" within the meaning of California Civil Code § 56.05(d) and California Civil Code § 56.06; a "business organized for the purpose of maintaining medical information" and a "business that offers software or hardware to consumers . . . that is designed to maintain medical information" within the meaning of California Civil Code § 56.06(a) and (b).

519. Aflac maintained and continues to maintain "medical information," within the meaning of California Civil Code § 56.05(j).

520. California Plaintiffs and California Subclass Members are "enrollees," "patients," or "subscribers within the meaning of California Civil Code § 56.05(e), (m), (t) and are "endanger[ed]" within the meaning of Civil Code § 56.05(e) because California Plaintiffs and California Subclass Members fear that disclosure of their medical information could subject them to harassment or abuse.

521. California Plaintiffs and California Subclass Members, as enrollees, patients, or subscribers, had their individually identifiable "medical information," within the meaning of Civil Code § 56.05(j), created, maintained, preserved, and stored on Aflac's computer network at the time of the unauthorized disclosure.

522. The CMIA requires a "provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medial information [to] do so in a manner that preserves the confidentiality

of the information contained therein." Civil Code § 56.101.

523. The CMIA provides that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." *Id*; *see also* Ca. Civ. Code § 56.06(f)-(g) (requiring standards of confidentiality with respect to medical information and subjecting businesses to penalties for improper use and disclosure of medical information).

524. Aflac, through inadequate security, allowed unauthorized third-party access to California Plaintiffs' and California Subclass Members' medical information, without the prior written authorization of California Plaintiffs and California Subclass Members, as required by Civil Code § 56.10 of the CMIA.

525. In violation of Civil Code § 56.10(a), Aflac disclosed California Plaintiffs' and California Subclass Members' medical information without first obtaining authorization. California Plaintiffs' and California Subclass Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Aflac's violation of Civil Code § 56.10(a).

526. In violation of Civil Code § 56.10(e), Aflac further disclosed California Plaintiffs' and California Subclass Members' medical information to persons or entities not engaged in providing direct health care services to Plaintiff or Class members, or to their providers of health care or health care service plans or their insurers or self-insured employers.

527. Aflac violated Civil Code § 56.101 of the CMIA through its willful and knowing failure to maintain and preserve the confidentiality of the medical information of California Plaintiffs and California Subclass Members. Aflac's conduct with respect to the disclosure of

confidential Private Information was willful and knowing because Aflac designed and implemented the computer network and security practices that gave rise to the unlawful disclosure.

528. In violation of Civil Code § 56.101(a), Aflac negligently created, maintained, preserved, stored, abandoned, destroyed, or disposed of California Plaintiffs' and California Subclass Members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. California Plaintiffs' and California Subclass Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Aflac's violation of Civil Code § 56.101(a).

529. Plaintiff's and Class Members' medical information that was the subject of the unauthorized disclosure included "electronic medical records" or "electronic health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C. § 17921(5).

530. In violation of Civil Code § 56.101(b)(1)(A), Aflac's electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information. California Plaintiffs' and California Subclass Members' medical information was viewed by unauthorized individuals as a direct and proximate result of Aflac's violation of Civil Code § 56.101(b)(1)(A).

531. Aflac violated Civil Code § 56.36 of the CMIA through its failure to maintain and preserve the confidentiality of the California Plaintiffs' and California Subclass Members' medical information.

532. As a result of Aflac's above-described conduct, California Plaintiffs and California Subclass Members have suffered damages from the unauthorized disclosure and release of their individual identifiable "medical information" made unlawful by Civil Code §§ 56.10, 56.101, 56.36. 385. As a direct and proximate result of Aflac's above-described wrongful actions, inaction,

omissions, and want of ordinary care that directly and proximately caused the unauthorized disclosure, and violation of the CMIA, California Plaintiffs and California Subclass Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud-risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their Private Information, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their Private Information, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

533. Moreover, as Aflac has not implemented sufficient data security protection to safeguard the Private Information that remains in its possession from the threat of future cyberattacks, California Plaintiffs and California Subclass Members demand injunctive relief that would protect their Private Information from unauthorized access and disclosure.

534. California Plaintiffs, individually and for each member of the California Subclass, seeks nominal damages of $1,000 for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each Class Member, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

## COUNT VIII
## DECLARATORY JUDGMENT
## (On Behalf of Plaintiffs and the Nationwide Class)

535. Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1-435 as if fully set forth herein.

536. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Amended Complaint.

537. Aflac owed a duty of care to Plaintiffs and Class Members, which required them to adequately monitor and safeguard Plaintiffs' and Class Members' Private Information.

538. Aflac still possesses the Private Information belonging to Plaintiffs and Class Members.

539. An actual controversy has arisen in the wake of Aflac's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Private Information and whether Aflac is currently maintaining data security measures adequate to protect Plaintiffs and Class members from further data breaches that compromise their Private Information.

540. Plaintiffs allege that Aflac's data security measures remain inadequate. Plaintiffs will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

541. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Aflac owed and continues to owe a legal duty to secure the Private Information of customers, beneficiaries, employees, agents, and other individuals and to timely notify them of a data breach under the common law, state law, HIPAA, the FTCA, and industry standards;

b. Aflac's existing data monitoring measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect individuals' Private Information; and

c. Aflac continues to breach this legal duty by failing to employ reasonable measures to secure Private Information.

542. The Court also should issue corresponding prospective injunctive relief requiring Aflac to employ adequate security protocols consistent with legal and industry standards to protect members' Private Information, including the following:

a. Order Aflac to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members.

b. Order that, to comply with Aflac's explicit or implicit contractual obligations and duties of care, Aflac must implement and maintain reasonable security and monitoring measures, including, but not limited to:

i. prohibiting Aflac from engaging in the wrongful and unlawful acts alleged herein;

ii. requiring Aflac to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Aflac to delete and purge the Private Information of Plaintiffs and Class Members unless Aflac can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Aflac to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiffs' and Class Members' Private Information;

v. requiring Aflac to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Aflac's systems on a periodic basis;

vi. prohibiting Aflac from maintaining Plaintiffs' and Class Members' Private Information on a cloud-based database until proper safeguards and processes are implemented;

vii. requiring Aflac to segment data by creating firewalls and access controls so that, if one area of Aflac's network is compromised, hackers cannot gain access to other portions of Aflac's systems;

viii. requiring Aflac to conduct regular database scanning and securing checks;

ix. requiring Aflac to monitor ingress and egress of all network traffic;

x. requiring Aflac to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling Private Information, as well as protecting the Private Information of Plaintiffs and Class Members;

xi. requiring Aflac to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees'

compliance with Aflac's policies, programs, and systems for protecting personal identifying information;

xii. requiring Aflac to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Aflac's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii. requiring Aflac to meaningfully educate all Class Members about the threats they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

543. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Aflac's system. The risk of another such breach is real, immediate, and substantial. If another breach at Aflac occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

544. The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Aflac if an injunction is issued. Among other things, if another data breach occurs at Aflac, Plaintiffs and Class Members will likely be subjected to further fraud, identify theft, and other harms described herein. On the other hand, the cost to Aflac of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Aflac has pre-existing legal obligations to employ such measures.

545. Issuance of the requested injunction will not disserve the public interest. To the

contrary, such an injunction would benefit the public by preventing another data breach at Aflac, thus eliminating the additional injuries that would result to Plaintiffs and the millions of individuals whose Private Information would be further compromised.

546. Following the issuance of the declaratory relief requested herein, pursuant to 28 U.S.C. § 2202, Plaintiffs and the Class will seek any further necessary or proper relief, including damages, after reasonable notice and hearing, against Aflac.

**COUNT VIII**
**EXPENSES OF LITIGATION, O.C.G.A. § 13-6-11**
**(On Behalf of Plaintiffs and the Nationwide Class)**

547. Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1-435 as if fully set forth herein.

548. As alleged herein, Aflac acted in bad faith, was stubbornly litigious, or caused Plaintiffs and Class Members unnecessary trouble and expense with respect to the events underlying this litigation.

549. As alleged herein, Aflac harmed Plaintiffs and Class Members by failing to use reasonable measures to protect their Private Information and not complying with laws, regulations, and industry standards, requiring them to do so, including, but not limited to, the FTCA and HIPAA. Aflac's conduct was particularly unreasonable given the nature and amount of Private Information that it obtained, used, and stored and the foreseeable consequences of a data breach.

550. Aflac also has a duty under the Georgia Constitution which contains a Right to Privacy clause, Chapter 1, Article 1, to protect its customers', beneficiaries', employees', agents', and other individuals' Private Information. The Constitution states "no person shall be deprived of life, liberty, or property except by due process of law." Moreover, the Constitution identifies certain invasions of privacy, including the Public Disclosure of Private Life which prohibits the

public disclosure of private facts.

551. This duty has been recognized by the Georgia Supreme Court in the Restatement of the Law of Torts (Second) § 652A which specifically recognized four common law invasion of privacy claims in Georgia, which include (1) appropriation of likeness; (2) intrusion on solitude or seclusion; (3) public disclosure of private facts; and (4) false light.

552. Aflac's affirmative implementation of inadequate data security measures, its failure to resolve vulnerabilities and deficiencies, and its abdication of its responsibility to reasonably protect the Private Information of Plaintiffs and Class Members that it stored on its own servers and databases constitutes a violation of the Constitution and the Restatement of the Law of Torts (Second).

553. Aflac knew or should have known that it had a responsibility to protect the Private Information it stored, that it was entrusted with this Private Information, and that it was the only entity capable of adequately protecting the Private Information on its systems and databases.

554. Despite that knowledge, Aflac abdicated its duty to protect the Private Information that Aflac stored.

555. As a direct and proximate result of Aflac's actions, Plaintiffs' and Class Members' Private Information was accessed and stolen by cybercriminals. The Data Breach was a direct consequence of Aflac's abrogation of its data security responsibilities and its decision to employ knowingly deficient data security measures that knowingly left the Private Information unsecured. Had Aflac adopted reasonable data security measures, it could have prevented the Data Breach.

556. As further described above, Plaintiffs and Class Members have been injured and suffered losses directly attributable to the Data Breach.

557. Plaintiffs and Class Members therefore request that their claim for recovery of

expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

**COUNT IX**
**Violations of the Georgia Uniform Deceptive Trade Practices Act**
**O.C.G.A. §§ 10-1-370, *et seq*. ("GUDTPA")**

558. Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1-435 as if fully set forth herein.

559. Aflac, Plaintiffs, and Class Members are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), O.C.G.A. § 10-1-371(5).

560. Aflac engaged in unfair and deceptive acts and practices in violation of the GUDTPA, O.C.G.A. § 10-1-372, which states in pertinent part that it is a deceptive trade practice to:

> (a)(5) Represent[] that goods or services have sponsorship, approval, characteristics, . . . uses, [or] benefits . . . that they do not have;
>
> (a)(7) Represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another; or
>
> (a)(12) Engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

561. Aflac engaged in deceptive trade practices in violation of the GUDTPA, O.C.G.A. § 10-1-372(a)(5), (7), and (12), by, among other things:

a. Omitting and concealing the material fact that it did not employ reasonable data security and privacy measures to protect consumers' Private Information. Aflac could and should have made a proper disclosure to consumers (including their customers), by any other means reasonably calculated to inform consumers of the inadequate data security; and

b. Making express, implied, or implicit representations that their data security

practices were sufficient to protect consumers' Private Information. Aflac acquired consumers' Private Information. In doing so, Aflac made express, implied, or implicit representations that its data security practices were sufficient to protect consumers' Private Information. By virtue of accepting Plaintiffs' and Class Members' Private Information, Aflac implicitly represented that its data security processes were sufficient to safeguard the Private Information.

562. Past breaches in the insurance services industry put Aflac on notice that its data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information, and Aflac knew or should have known that the risk of a data breach was highly likely.

563. Because Aflac required Plaintiffs and Class Members to provide their Private Information as a prerequisite to their use of Aflac's products and services, Plaintiffs and Class Members reasonably expected that Aflac's data security and data storage systems were adequately secure to protect their Private Information.

564. Because Aflac required Plaintiffs and Class Members to provide their Private Information as a prerequisite to receive Aflac's products and services, Plaintiffs and Class Members relied on Aflac to advise customers if their data security, network, and data storage systems were not adequately secure to protect their Private Information.

565. Plaintiffs and Class Members had no opportunity to make any inspection of Aflac's data security practices or to otherwise ascertain the truthfulness of Aflac's representations and omissions regarding data security, including Aflac's failure to alert customers that their data security, network, and data storage systems were not adequately secure and, thus, were vulnerable to attack.

566. Plaintiffs and Class Members relied to their detriment on Aflac's

misrepresentations and deceptive omissions regarding its data security practices.

567. Had Aflac disclosed to Plaintiffs and Class Members that its data security, network, and data storage systems were not secure, and thus, vulnerable to attack, Plaintiffs and Class Members would not have entrusted Aflac with their Private Information.

568. As a direct and proximate result of Aflac's unfair and deceptive business practices, Plaintiffs and Class Members suffered ascertainable losses, including but not limited to, a loss of privacy, the loss of the benefit of their bargain, out-of-pocket monetary losses and expenses, the value of their time reasonable incurred to remedy or mitigate the effects of the Data Breach, the loss of value of their Private Information, the imminent and substantially increased risk of fraud and identity theft, and the need to dedicate future expenses and time to protect themselves against further loss.

569. To date, Aflac has not provided sufficient details regarding the full scope of the Data Breach, or any details related to the remedial measures it has or will implement to improve its data security practices and more fully safeguard Plaintiffs' and Class Members' Private Information from future compromise. As a result, Plaintiffs, Class Members, and Aflac's susceptible to future cyberattacks. Without adequate improvements, Plaintiffs' and Class Members' Private Information remains at an unreasonable risk of future compromise.

570. Moreover, Aflac, through its omissions and Data Breach Notice Letters, continues to represent and imply that its data security measures are adequate to protect consumers' Private Information. Such continued representations and implications, without disclosure of the full scope of the Data Breach or Aflac's subsequent remedial enhancements, place Plaintiffs and Class Members at a future risk of harm, as Aflac continues to store Plaintiffs, Class Members, and Aflac's Private Information and they are not fully informed as to whether Aflac's data security

measures have been improved since the Data Breach. By all available measures, Aflac's data security practices and systems have not been adequately improved, and Plaintiffs and Class Members remain at an unreasonable risk from future cyberattacks.

571. Plaintiffs and Class Members are therefore entitled to the injunctive relief sought herein, because, among other things, Aflac continues to retain their Private Information, future cyber-attacks targeting the same data are reasonably foreseeable, and Aflac has not provided sufficient notice identifying any remedial measures that will protect the data from future attack. Moreover, absent injunctive relief, Aflac will continue to misrepresent and imply that its data security practices and systems are adequate to protect the Private Information of Plaintiffs and the Class from future cyberattacks without providing any firm details or basis to support these representations.

572. The GUDTPA states that the "court, in its discretion, may award attorney's fees to the prevailing party if . . . [t]he party charged with a deceptive trade practice has willfully engaged in the trade practice knowing it to be deceptive." O.C.G.A. § 10-1-373(b)(2). Aflac willfully engaged in deceptive trade practices knowing them to be deceptive. Aflac knew or should have known that its data security practices were deficient. Aflac were aware that entities responsible for collecting and maintaining large amounts of Private Information, including Social Security numbers, financial information, and health and medical information, are frequent targets of sophisticated cyberattacks. Aflac knew or should have known that its data security practices were insufficient to guard against those attacks.

573. The GUDTPA states that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs." O.C.G.A. § 10-1-373(b). Plaintiffs and the Class are entitled to recover their costs of pursuing this litigation.

574. Plaintiffs and the Class seek all monetary and non-monetary relief allowed by the GUDTPA, including injunctive relief and attorneys' fees.

## REQUEST FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against Aflac by:

A. Determining that this matter may proceed as a class action and certifying the Class asserted herein;

B. Appointing Plaintiffs as representatives of the applicable Class and appointing Plaintiffs' counsel as Class Counsel;

C. Awarding to Plaintiffs, the Nationwide Class and California Subclass actual, compensatory, statutory, and nominal damages as set forth above;

D. Entering a declaratory judgment stating that Aflac owed and breached legal duties to secure its customers, beneficiaries, employees, agents, and other individuals sensitive Private Information, timely notify them of any data breach, and establish and implement data security measures that are adequate to secure sensitive personal information;

E. Ordering mandatory injunctive relief requiring Aflac to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide no less than ten years of free credit monitoring and identity theft insurance to all Class Members; and (iv) timely notify customers of any future data breaches;

F. Awarding attorneys' fees, costs, and expenses, including expert witness fees pursuant to O.C.G.A. 13-6-11, O.C.G.A. § 10-1-373(b), and as otherwise allowable by law;

G. Awarding pre-judgment and post-judgment interest, as provided by law or equity; and

H. Entering such other relief as the Court may allow.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 14, 2026

Respectfully submitted,

*/s/ Michael L. McGlamry*

Michael L. McGlamry (GA Bar No. 492515)
**POPE MCGLAMRY**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523.7706
mmcglamry@pmkm.com

Casondra Turner (GA Bar No. 418426)
**MILBERG, PLLC**
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
Telephone: (866) 252-0878
Fax: (771) 772-3086
cturner@milberg.com

Jeff Ostrow (admitted *pro hac vice*)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
(954) 332-4200
ostrow@kolawyers.com

John A. Yanchunis (admitted *pro hac vice*)
Ronald Podolny (admitted *pro hac vice*)
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 275-5272
jyanchunis@forthepeople.com
ronald.podolny@forthepeople.com

Larry A. Golston, Jr. (admitted *pro hac vice*)
**BEASLEY ALLEN LAW FIRM**
272 Commerce Street
Montgomery, AL 36104
(334) 269-2343

larry.golston@beasleyallen.com

MaryBeth V. Gibson (GA Bar No. 725843)
**GIBSON CONSUMER LAW GROUP, LLC**
4279 Roswell Road Suite 208-108
Atlanta, GA 30342
Tel. 678.642.2503
marybeth@gibsonconsumerlawgroup.com

*Interim Co-Lead Counsel for Plaintiffs*
*and the Putative Classes*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 14, 2026, the foregoing Consolidated Class Action Complaint was filed using CM/ECF, which will send service of same to all counsel of record.

*/s/ Michael L. McGlamry*
Michael L. McGlamry